UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, § § § Plaintiff, § § vs. § TECHNIP, § § Defendant. § § § | § § § § § Civil Action No. 4:10-cv-2289 § § COMPLAINT § § § § |

Plaintiff Securities and Exchange Commission (the "Commission") alleges:

## SUMMARY

1. This action arises from multiple violations of the Foreign Corrupt Practices Act (the "FCPA") of the federal securities laws by Defendant Technip ("Technip" or "Defendant").

2. Between at least 1995 and 2004, senior executives at Technip, among others, devised and implemented a scheme to bribe Nigerian government officials to assist in obtaining multiple contracts worth over $6 billion to build liquefied natural gas ("LNG") production facilities on Bonny Island, Nigeria. A four-company joint venture called "TSKJ," of which Technip was a member, won the contracts. To conceal the illicit payments, Technip and others, through the joint venture, entered into sham "consulting" or "services" agreements with intermediaries who would then funnel their purportedly legitimate fees to Nigerian officials. Specifically, Technip, through the joint venture, implemented this scheme by using a Gibraltar shell company controlled by a solicitor based in the United Kingdom ("the UK Agent") and a Japanese trading company ("the Japanese Agent") as conduits for the bribes.

1

3. As a result of the scheme, numerous books and records of Technip contained false information relating to, among other things, the UK Agent and the Japanese Agent, and the payments made to them.

4. Technip was a U.S. issuer between August 30, 2001 and November 14, 2007. Technip registered securities with the Commission pursuant to Section 12(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78l(b)].

5. Technip was a member of the TSKJ joint venture and engaged in illegal bribery from at least 1995 through June 2004. The Commission brings this action against the Defendant seeking permanent injunctive relief to prevent future violations of the federal securities laws, and seeking its ill-gotten gains.

## JURISDICTION

6. This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa].

7. Technip, directly and indirectly, made use of the mails and of the means and instrumentalities of interstate commerce in connection with the acts, practices and courses of business described in this Complaint.

## DEFENDANT

8. Technip is a French corporation, headquartered in Paris, France. American Depository Shares, representing ordinary shares of Technip, were registered with and listed on the New York Stock Exchange.

**FACTUAL ALLEGATIONS**

**Technip Agrees to Pay Bribes to Obtain Nigeria LNG Contract**

9.  In the late 1980s, the Nigerian government created Nigeria LNG, Ltd. ("Nigeria LNG") to capture and sell the natural gas associated with oil production in Nigeria. Nigeria LNG is an entity and instrumentality of the Nigerian government. At all relevant times, the Nigerian government owned 49% or more of Nigeria LNG and, through the directors that it appointed to the Board of Directors of Nigeria LNG, the Nigerian government exercised control over the company. Three multinational companies own the remainder of Nigeria LNG. Nigerian employees of Nigeria LNG are detailed from the Nigerian Ministry of Petroleum Resources or the government-owned Nigerian National Petroleum Corp. ("NNPC"). In the early 1990s, Nigeria LNG invited bids to construct two LNG "trains" on Bonny Island, Nigeria, estimated to be worth $1.8 billion. An LNG train is a facility to convert raw natural gas into pure LNG, ready for delivery to a tanker.

10. In 1990, in order to pursue LNG projects in Nigeria, Technip formed a joint venture with three other multinational engineering and construction companies. The joint venture began to pursue bidding on a construction contract for Nigeria LNG to build two LNG trains in Nigeria. The joint venture operated through entities incorporated in Madeira, Portugal.

11. Executives and employees at the highest level of Technip were closely involved in the joint venture and its business in Nigeria from the joint venture's inception. Each member of the joint venture had one or more representatives on a steering committee that ran the joint venture.

12. From the inception of the joint venture, the sales executives and other senior personnel of the four joint venture members believed that it was necessary to pay bribes to

3

Nigerian government officials to assist in obtaining the LNG construction contracts. In conjunction with the Japanese Agent, the sales executives of the joint venture companies formed what they called the "cultural committee" to consider how to implement, but hide, the scheme to pay bribes. The committee members discussed: (i) entering into sham consulting contracts with various individuals or shell corporations; (ii) "downloading" or "offloading" the payments through subcontractors or vendors; and (iii) entering into phony "services" contracts with the Japanese Agent. Ostensibly, the consultants or vendors would be retained and paid to perform legitimate services. In actuality, the consultants or vendors would use the money in whole or in part to make corrupt payments to Nigerian government officials on behalf of the joint venture.

13. Eventually, the joint venture decided to funnel the payments through two entities, using the UK Agent to pay high-ranking Nigerian officials, and using the Japanese Agent to pay lower-level Nigerian officials. These agents were sometimes referred to as "Cultural Advisors." The joint venture steering committee approved the use of the two agents, and the steering committee approved the contracts eventually entered into between the joint venture and the two agents.

14. In pursuing the bidding with Nigeria LNG, in holding meetings of the steering committee and the cultural committee, in carrying out the construction contracts, and in all related matters, Technip and the other members of the joint venture routinely made use of the U.S. mails, and of U.S. common carriers, and of other instrumentalities of U.S. interstate commerce. Payments made by the joint venture to the bank accounts of the UK Agent were routed through banks in New York, New York.

**The UK Agent**

**Trains One and Two**

15.     The joint venture decided to use the UK Agent for Trains One and Two.  Before the joint venture entered into a written contract with the UK Agent, executives from Technip and other representatives of the joint venture traveled to Nigeria to meet with high-ranking Nigerian government officials in November 1994 to discuss the possible use of the UK Agent.  The officials confirmed that the UK Agent was the right conduit.  Thereafter, in March 1995, the joint venture entered into an agreement to pay the UK Agent $60 million, with the understanding that a substantial portion of this money would be funneled to Nigerian officials as bribes.

16.     In December 1995, Nigeria LNG awarded the joint venture the contract to build the first two LNG Trains, for $2.2 billion.  The joint venture began construction in 1996 and finished in 2000.  As the joint venture received payments for the construction from Nigeria LNG, it paid the UK Agent.  The joint venture sent a total of $60 million to the UK Agent's Swiss bank account between December 1995 and March 2000 for use in making corrupt payments to Nigerian government officials.

17.     As the UK Agent received these payments, the UK Agent made systematic and substantial transfers of money to accounts owned or controlled by one or more high-ranking Nigerian government officials.

**Train Three**

18.     In 1996, the joint venture began pursuing a contract with Nigeria LNG to build Train Three on Bonny Island, Nigeria. In May 1997, at least one senior executive from Technip, along with others in the joint venture, traveled to Nigeria to meet  with high-ranking Nigerian

government officials to confirm that the UK Agent was still the correct intermediary to use to pay bribes.

19. In February 1999, following a change in government, an executive from Technip and others from the joint venture, traveled to Nigeria to meet a high-ranking Nigerian government official who confirmed that the UK Agent was the correct intermediary. The Nigerian official also appointed his own representative to negotiate the bribe amount. In March 1999, an executive from Technip and others from the joint venture met with the Nigerian official's representative in London to negotiate the amount of the bribes to be paid in connection with the award of the Train Three LNG contract. Technip, along with the other joint venture partners, agreed to pay $32.5 million through the UK Agent.

20. Days after the London meeting, Nigeria LNG awarded the Train Three contract to the joint venture for $1.2 billion. The joint venture then entered into a new agreement with the UK Agent for the $32.5 million negotiated at the London meeting. Between March 1999 and May 2003, the joint venture paid the UK Agent, directing the payments to the UK Agent's bank accounts in Switzerland and Monaco. After receiving the money, the UK Agent made substantial payments to accounts controlled by one or more high-ranking Nigerian government officials.

### **Trains Four and Five**

21. In approximately 2001, the joint venture discussed the award of the next series of LNG Trains. In November 2001, a joint venture representative and others traveled to Nigeria to meet a high-ranking government official, who confirmed that the UK Agent was still acceptable to serve as a conduit for the payments and who appointed his own representative to negotiate the bribe amount.

22. In December 2001, the joint venture entered into another agreement with the UK Agent in connection with Trains Four and Five for $51 million. In March 2002, Nigeria LNG awarded the joint venture a $1.6 billion contract to build Trains Four and Five. Between March 2002 and January 2004, the joint venture paid the UK Agent $40 million under the sham consulting agreement. After receiving the money, the UK Agent made substantial transfers of money to one or more high-ranking Nigerian government officials.

23. In one instance, the UK Agent used a subcontractor on the Nigeria LNG project (the "Subcontractor") to transfer $5 million to a Nigerian government official for the benefit of a Nigerian political party. The Subcontractor official, the UK Agent and the Nigerian government official met in London in June 2002 to discuss the terms of the transfer.

24. Beginning in August 2002, the UK Agent wire transferred $5 million from money received from the joint venture to a bank account of the Subcontractor in the U.K. The Subcontractor then transferred this money to a bank account in Nigeria. Thereafter, as the money came in, the Subcontractor withdrew cash in U.S. dollars or in local currency and delivered the money to the Nigerian official.

25. On several occasions, the Subcontractor personally hand-delivered $1 million in U.S. currency in a brief case to the Nigerian official in a hotel room in Abuja, Nigeria. The Subcontractor delivered the remainder of the $5 million to the Nigerian official in local Nigerian currency, the Naira. Because the Naira was too bulky to deliver by hand, the Subcontractor loaded the cash into vehicles, which were delivered to the Nigerian official.

### The Japanese Agent

26. As alleged above, Technip and others in the joint venture agreed to use the Japanese Agent to make corrupt payments to lower-level Nigerian government officials in connection with the Bonny Island LNG Trains.

27. Between 1996 and 2002, the joint venture entered into three "services" agreements with the Japanese Agent. Technip and others authorized and directed the joint venture to enter into each of the agreements with the Japanese Agent intending and expecting that the Japanese Agent would use money it received under these agreements to offer and make corrupt payments to lower-level Nigerian officials to assist in obtaining the LNG contracts to build Trains One through Five.

28. Between 1996 and June 2004, when the payments ended, the joint venture paid the Japanese Agent more than $50 million.

### Documents at Technip Contained False Information

29. In numerous joint venture company records, the payments to the UK Agent and the Japanese Agent were falsely characterized as legitimate "consulting" or "services" fees when, in fact, they were bribes. The contracts with the UK Agent and the Japanese Agent falsely described the purpose of the contracts in order to make it appear that the agents would perform legitimate services. Senior executives of Technip maintained the joint venture records as part of Technip's company records.

### Internal Controls at Technip Failed to Detect, Deter or Prevent Bribery

30. Technip conducted due diligence on the UK Agent that was not adequate to detect, deter or prevent the UK Agent from paying bribes, and Technip conducted no due diligence on the Japanese Agent.

31. After Technip became a U.S. issuer in August 2001, it became subject to the FCPA, including the Act's prohibitions on the payment of anything of value to foreign government officials to assist in obtaining or retaining business. Although the executives of Technip who participated in the joint venture were aware of these prohibitions, Technip did not implement adequate controls to ensure compliance with the Act. For example, Technip did not adopt due diligence procedures as to agents that were adequate to detect, deter or prevent the payment of bribes by agents. The due diligence procedures adopted by Technip only required that potential agents respond to a written questionnaire, seeking minimal background information about the agent. No additional due diligence was required, such as an interview of the agent, or a background check, or obtaining information beyond that provided by the answers to the questionnaire. A senior executive of Technip admitted that the due diligence procedures adopted by Technip were a perfunctory exercise, conducted so that Technip would have some documentation in its files of purported due diligence. In fact, Technip executives knew that the purpose of the agreements with the UK Agent was to funnel bribes to Nigerian officials, and therefore certain answers by the UK Agent to the questionnaire were false.

## FIRST CLAIM FOR RELIEF

### Technip Violated Section 30A of the Exchange Act
### (Anti-Bribery Provisions of the Foreign Corrupt Practices Act)

32. Paragraphs 1 through 31 are realleged and incorporated herein by reference.

33. As described above, Technip, a U.S. issuer between August 30, 2001 and November 14, 2007, through its employees and the joint venture, made use of the mails or other means or instrumentality of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, or authorization of the payment of any money, or offer, gift, promise to give, or authorization of the giving of anything of value, to foreign officials for the purposes of

influencing their acts or decisions, securing an improper advantage, or inducing them to use their influence, to assist the issuer in obtaining or retaining business.

34.     By reason of the foregoing, Technip violated, and unless restrained and enjoined will continue to violate, Section 30A of the Exchange Act [15 U.S.C. § 78dd-1].

### SECOND CLAIM FOR RELIEF

### Technip Violated Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act
### (Company Records and Internal Controls)

35.     Paragraphs 1 through 34 above are realleged and incorporated by reference herein.

36.     Section 13(b)(2)(A) of the Exchange Act requires companies to keep accurate books, records and accounts which reflect fairly the transactions entered into by companies and the disposition of its assets.

37.     Section 13(b)(2)(B) requires companies to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for such assets.

38.     By reason of the foregoing, Technip violated Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A) & (B)].

### PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

(1)     Enter a final judgment permanently enjoining Technip from violating Sections 30A, 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78dd-1, 78m(b)(2)(A) and 78m(b)(2)(B)];

  (2) Enter a final judgment ordering Defendant Technip to disgorge ill-gotten gains wrongfully obtained as a result of its illegal conduct; and

  (3) Grant the Commission such other and further relief as is just and appropriate.

Dated: June 28, 2010        Respectfully submitted,

               _s/ Mark A. Adler_____
               Mark A. Adler (Attorney-in-charge)
               Antonia Chion
               Kara N. Brockmeyer
               Robert G. Wilson
               Stanley M. Cichinski
               Ansu N. Banerjee

               Attorneys for Plaintiff
               Securities and Exchange Commission
               100 F Street, N.E.
               Washington, DC  20549-4030
               Tel:  (202) 551-4402 (Adler)
               Fax: (202) 772-9245 (Adler)